# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PUBLIC INTEREST LEGAL FOUNDATION, | : | 1:20-cv-1905 |
| Plaintiff, | : | |
| | : | |
| v. | : | Hon. John E. Jones III |
| | : | |
| KATHY BOOCKVAR, *Secretary of the Commonwealth of Pennsylvania, in her official capacity* | : | |
| Defendant. | : | |

## MEMORANDUM

### October 20, 2020

Two-and-a-half weeks before a national election of critical importance, Plaintiffs filed the instant suit alleging the improper inclusion of 21,206 supposedly deceased Pennsylvanians on voter rolls. In so doing, it asked us to accept as true its private investigation into the eligibility of thousands of voters. But we cannot and will not take Plaintiff's word for it—in an election where every vote matters, we will not disenfranchise potentially eligible voters based solely upon the allegations of a private foundation. And, because Plaintiff waited until the eleventh hour to file this suit, there is clearly insufficient time to require Defendant to separately verify Plaintiff's extensive claims. Thus, for the reasons that follow, we have denied the Motion.[1]

---

[1] On October 19, 2020, we denied Plaintiff's Motion for Preliminary Injunction. (Doc. 27). This memorandum now follows to explain our reasoning.

1

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Plaintiff filed a Motion for Preliminary Injunction on October 15, 2020 asking us to excise the names of thousands of "potentially deceased" voters from voter rolls across Pennsylvania. (Doc. 4). It did so after first analyzing the Pennsylvania voter rolls in early 2020. (Doc. 5 at 10). In so doing, it examined a list of registrants who were classified in the Commonwealth's SURE database as "active" in September of 2019. (*Id.*). Plaintiff compared the full names and birthdates on the active registrant list to records contained in the Social Security Death Index, "commercial databases," and in public obituaries. (*Id.*). It ultimately identified approximately 9,300 individuals on Pennsylvania's active voter registration list that it believed were deceased. (*Id.*).

Plaintiff detailed these findings in a letter to Defendant dated May 26, 2020. (Pl. Ex 1). Defendant sought additional data from Plaintiff, which was provided on July 17, 2020. (Doc. 5 at 10-11). Plaintiff avers that it recieved no further communication from Defendant. (*Id.* at 11).

On September 18, 2020, Plaintiff sent a Notice Letter to Defendant and her legal counsel notifying them that the Commonwealth was in violation of the National Voter Registration Act ("NVRA"). (*Id.*). The letter recounted Plaintiff's findings and efforts to communicate with the Commonwealth. (Pl. Ex. 2).

On September 21, 2020, Plaintiff purchased another copy of Pennsylvania's voter rolls to determine whether any further effort had been made to remove deceased registrants from the voter rolls. (*Id.*). Notably, this search included both active and inactive registrants.[2] (*Id.*). According to Plaintiff, as of September 21, 2020, there were 21,248 deceased registered voters in Pennsylvania (both active and inactive). (*Id.* at 12). On October 7, 2020, this number had decreased slightly to 21,206 deceased registered voters. (*Id.*). Despite believing that the number of allegedly deceased voters had more than doubled, however, Plaintiffs did not notify Defendant, provide an updated list, or file this suit for, at a minimum, a week and a half. Plaintiff's counsel confirmed to the Court that they did not provide an updated list to Defendant until Saturday, October 17, a mere 48 hours before our scheduled hearing in this matter.

Plaintiff filed a brief in support of their Motion on October 15, 2020. (Doc. 5). In response, we scheduled a hearing on this matter for October 19, 2020. (Doc. 12). Defendant filed a brief in opposition on October 19, 2020. (Doc. 21). On the

---

[2] A voter is marked as inactive if he or she is sent a mailing by the county asking the voter to confirm his or her continued residence and fails to respond. Voters may be sent the mailings based on data the county receives under the U.S. Postal Service National Change of Address (NCOA) program or when a voter fails to vote for five years. *See* 25 Pa. C.S. §§ 1901(b)(1), 1901(b)(3), 1901(c). Inactive voters can still vote on Election Day, but they must sign an affirmation that they still live at the address currently on file with the board of elections. If a voter is "inactive" for two consecutive nationwide elections, they may be purged from the voter rolls.

same day, she also filed a Motion to Strike Expert Report and Preclude the Testimony of Kenneth J. Block and accompanying brief. (Docs. 22, 23). On October 19, we heard oral argument from both parties and denied Plaintiff's Motion for Preliminary Injunction. (Doc. 27). This memorandum now follows to explain our reasoning.

## II.   STANDARD OF REVIEW

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1373–74 (Fed. Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008)).

The Supreme Court has emphasized that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Apotex Inc. v. U.S. Food and Drug Admin.*, 508 F.Supp.2d 78, 82 (D.D.C. 2007) ("Because interim injunctive relief is an extraordinary form of judicial relief, courts should grant such relief sparingly."). "Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing

that the plaintiff is entitled to such relief.'" *Groupe SEC USA, Inc. v. Euro–Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter*, 555 U.S. at 22).

Moreover, "[a]n injunction is mandatory if the injunction will either (1) 'alter the status quo by commanding some positive act' or (2) provide the moving party with 'substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits.'" *Coast to Coast Entm't, LLC v. Coastal Amusements, Inc.*, No. 05-3977, 2005 WL 7979273, at *9 (D.N.J. Nov. 7, 2005) (quoting *Tom Doherty Assocs. v. Saban Entm't*, 60 F.3d 27, 33–34 (2d Cir. 1995)), *aff'd*, 931 F.3d 215 (3d Cir. 2019). "[W]here the relief ordered by the preliminary injunction is mandatory and will alter the status quo, the party seeking the injunction must meet a higher standard of showing irreparable harm in the absence of an injunction," as mandatory injunctions are generally disfavored. *Bennington Foods LLC v. St. Croix Renaissance, Grp., LLP*, 528 F.3d 176, 179 (3d Cir. 2008).

### III. DISCUSSION

As a threshold matter, we find that Plaintiff seeks a mandatory injunction and will apply the applicable heightened standard. Were we to grant Plaintiff its requested preliminary relief, the status quo in this case would be irreparably altered—if the allegedly deceased individuals are removed, but are in fact alive, they cannot vote in the 2020 election. There would be nothing we could do to

alleviate that fact at a trial on the merits. Furthermore, Plaintiff's proffered relief would require Defendant to take the "positive act" of actively removing registered voters from voter rolls. Thus, Plaintiff must bear the "particularly heavy" burden of demonstrating a right to relief that is "indisputably clear." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

### A. Likelihood of Success on the Merits

Plaintiff's claim implicates both the National Voter Registration Act and Pennsylvania state law. Section 8 of the NVRA requires election officials to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of the death of the registrant." 52 U.S.C. § 20507(a)(4)(A). While election officials are required to remove any ineligible voters from official lists no later than 90 days before the date of a general election, the removal of deceased registered voters is exempt from this requirement. 52 U.S.C. §20507(c)(2)(B)(i). Thus, deceased registered voters may be removed from the voter rolls at any time.

The Secretary of the Commonwealth of Pennsylvania is the chief election official of Pennsylvania and is responsible for coordination of the Commonwealth's responsibilities under the NVRA. 52 U.S.C. §2059.

Pennsylvania state law also mandates the removal from voter rolls of any elector who has been reported deceased by the Pennsylvania Department of Health

("DOH"). 25 PA. CONS. STAT §1505(a). DOH is required to report to the appropriate county commission the death of any Pennsylvanian 18 years or older within 60 days of receiving notice of the individual's death. *Id*. Individual counties are then directed to "cancel the registration" of deceased electors. *Id.*

Pennsylvania's voter registration system, called SURE, is designed to allow election officials to "add, modify, and delete information in the system as is necessary and appropriate." 25 PA. CONS. STAT. §1222(c)(4). All county election commissions are connected electronically to SURE and are required to maintain their registration records in the system. 25 PA. CONS. STAT. §1222(c).

Plaintiff does not allege that this program itself is deficient, nor does it point to a specific breakdown that makes the program "unreasonable." Instead, Plaintiff argues that the sheer number of allegedly deceased registered voters it has uncovered is a "hallmark of an unreasonable list maintenance program." (Doc. 5 at 9). We disagree. Approximately 130,000 Pennsylvanians die every year.[3] This means that, even assuming all 22,206 "apparently" deceased individuals died in the same year, a maximum of 17% of deceased registered voters have not been

---

[3]   *Pennsylvania Death Projections,* Pennsylvania Department of Health, JUNE 1, 2020, https://www.health.pa.gov/topics/HealthStatistics/VitalStatistics/DeathStatistics/Documents/Death_Projections.aspx (last accessed October 19, 2020).

removed from the voter rolls. [4] As Plaintiff's counsel acknowledged at yesterday's hearing, the NVRA does not require perfection. (Unofficial Transcript at 9). Nor shall we.

Without allegation, let alone proof, of a specific breakdown in Pennsylvania's voter registration system, we cannot find that the many procedures currently in place are unreasonable. Pennsylvania law *requires* the Department of Health, the department which issues death certificates, to promptly notify local election commissions that an adult Pennsylvanian has died. 25 PA. CONS. STAT §1505(a). County commissioners are then *required* to cancel those registrations. *Id.* In furtherance of that goal, Defendant has maintained the SURE system, which allows election officials to "add, modify, and delete information in the system as is necessary and appropriate." 25 PA. CONS. STAT. §1222(c)(4). Defendant provides proof that she has done just that—91,424 deceased voters were removed in 2018[5] and 95,670 in 2019.[6] Because Plaintiff does not provide factual support from which

---

[4]  Plaintiff notes that up to 10% of the voters it has uncovered died before 2010, so the percentage of voters per year who remain on the rolls after death is likely much lower. (Doc. 5 at 12).

[5]  The Pennsylvania Department of State's Report to the General Assembly identifies the number of voter registrations cancelled in 2018 as 79,178 active voters and 12,246 inactive voters. The data appears on page 8 of the report which is available at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/Annual%20Reports%20on%20Voter%20Registration/2018%20ANNUAL%20REPORT.pdf (last visited October 18, 2020).

[6]  The Pennsylvania Department of State's Report to the General Assembly identifies the number of voter registrations cancelled in 2019 as 83,831active voters and 11,839 inactive

we could find otherwise, it has not carried its heightened burden of showing that success on the merits is "indisputably clear." *Trinity Indus., Inc. v. Chicago Bridge & Iron Co.*, 735 F.3d 131, 139 (3d Cir. 2013).

Furthermore, we note that Plaintiff's proffered list of 21,206 allegedly deceased registered voters does not tell the whole story. As noted by defense counsel at yesterday's hearing, of the initially-proffered 9,300 deceased registered voters, approximately 5,000 did not appear on Plaintiff's September or October lists. (Unofficial Transcript at 13-14). To be sure, this could be the result of a number of factors, including inadequacies in Plaintiff's data-mining procedures. But it is also possible that this change was the result of state and county efforts to remove ineligible voters. Defense counsel candidly acknowledged that he could not attribute the entirety of the 5,000-voter discrepancy to state removal efforts. Nevertheless, we find this fact weighs in favor of the reasonableness of the state's list maintenance program. It is hard to believe that such a large disparity could be the result of a mistake. Instead, absent evidence from the moving party indicating otherwise, we find that this change leans in favor of the state's efforts to update voter rolls with the latest data on voter eligibility.

---

voters. The data appears on page 8 of the report which is available at https://www.dos.pa.gov/VotingElections/OtherServicesEvents/VotingElectionStatistics/Documents/Annual%20Reports%20on%20Voter%20Registration/2019%20Annual%20Report.pdf (last visited October 18, 2020).

## B. Balancing the Equities and Public Interest[7]

Plaintiff argues that the public has a great interest in ensuring free and fair elections. (Doc. 5 at 27). This is without question. But the public also has a great interest in safeguarding the right of every eligible, registered voter to make their voices heard in a national election.

As previously noted, Plaintiff proffers a list of 21,206 individuals who are "apparently dead." (Doc. 5 at 8). We have no reason to assume that Plaintiff did not make every effort to ensure the veracity of this list. But even assuming the highest quality control standards were in place in the creation of Plaintiff's list, we will not allow a private foundation to dictate the voter eligibility of thousands of Pennsylvania voters—Defendant has every right to verify this list before disenfranchising potentially eligible voters.

By their own admission, Plaintiff utilized the full names and birthdates of registrants, compared to the Social Security Death Index, various commercial databases, and public obituaries. (Doc. 5 at 10). Glaringly, however, Plaintiff has provided only *one* completely individualized data point for their allegedly deceased individuals—voter registration numbers. (Unofficial Transcript at 20).

---

[7] We do not doubt that Plaintiff could establish irreparable harm if it were likely to succeed on the merits of their claim. The American people have every right to a free and fair election in which only eligible, registered electors cast ballots. *Tex. Democratic Party v. Abbott*, 961 F.3d 389, 413 (5th Cir. 2020). Plaintiff's claim, however, must nevertheless fail for the reasons stated herein.

Plaintiff also provided birth and death dates and, in some cases, provided a county. But, this information could easily be identical across multiple individuals. (Unofficial Transcript at 20). Plaintiff did not provide middle initials, city of residence, voter affiliation, social security numbers, or driver's license numbers. (Unofficial Transcript at 20).[8] We are not convinced that Defendant would be able to verify Plaintiff's list without more, let alone do so before the election. These data points are integral to ensuring the proper voters are removed from the rolls, and their exclusion results in a slower, less efficient verification process.

And, most importantly, it should be noted that efficiency is of the essence in this case. As of the date of this writing, the 2020 national election is but two weeks away. Pennsylvania's deadline to begin printing initial voter rolls was yesterday. (Unofficial Transcript at 7). Plaintiff had reason to believe that deceased individuals were on Pennsylvania's voter rolls as early as May 2020. It nonetheless waited until the eleventh hour to file this suit, all but ensuring that Defendant and the Court would have to accept Plaintiff's list as true in crafting an appropriate order to cleanse the rolls. Neither the court nor the Defendant have the capacity to timely verify Plaintiff's allegation that over 21,000 deceased individuals remain on

---

[8] Defendant also notes several "glaring issues" she has found in Plaintiff's list, chief among them the fact that there are people on the list who have a date of death before they are registered to vote. To be sure, this could be a result of voter fraud. But it could also mean that Plaintiffs have inadvertently merged the identities of a living voter and a deceased individual and now ask us to remove an eligible voter from the rolls. We cannot take this risk at such a late hour in an election expected to have razor-thin margins.

Pennsylvania's rolls, or that the names of those individuals are accurate. Tellingly, Plaintiff itself spent months compiling this list; it strains credulity to think that Defendant could do the same work in less than two weeks. We decline to cast aspersions or to speculate as to Plaintiff's motives in delaying their filing. But we also decline to order Defendant to engage in mass purging of its voter rolls based solely on Plaintiff's uncorroborated and untimely list of purportedly ineligible voters. Plaintiff's decision to file its motion days before the state began printing its rolls does not affect this balance,[9] and we decline to order such drastic action simply because Plaintiff elected to file its suit on the eve of the national election. *See Republican Party of Pa. v.* Cortes, 218 F.Supp. 3d 396, 405 (E.D. Pa. 2016) ("There was no need for this judicial fire drill and Plaintiffs offer no reasonable explanation or justification for the harried process they created.").[10]

We further find that the relief sought in this case would actively harm Defendant's interests. Defendant is tasked with ensuring that all eligible, registered voters can vote in a free and fair election. Mass-purging of voters at this late hour,

---

[9] Plaintiff argues that no eligible voter will be harmed by their requested relief because provisional ballots can be issued to any living individual who is mistakenly removed from the voter rolls. (Unofficial Transcript at 30). But we agree with the Defendant that, during a global pandemic, requiring eligible, registered voters to remain in enclosed polling places for extended periods of time to complete the provisional ballot process is an untenable solution.

[10] We are further assuaged by the various protections Pennsylvania has in place against voter fraud. If, for example, a person arrives at the polls to vote under an inactive registration, proof of residency is required.

without verification, would cut directly against this interest. Indeed, the Supreme Court has urged against such drastic, last minute changes. *Purcell v. Gonzalez*, 549 U.S. 1, 4-5 (2006). While Plaintiff argues that its requested relief would not run afoul of the *Purcell* principle, this is patently not the case. Plaintiff's requested relief would require Defendant to remove allegedly deceased voters—a task exclusively within the purview of county election officials to date. (Unofficial Transcript at 16-17). Ostensibly, the Pennsylvania legislature thought county officials were in the best position to verify the identity of deceased individuals and remove them accordingly. Plaintiff now asks us to overhaul this procedure at the last minute without notice to county officials or to individual voters. Such an act would undoubtedly cause voter confusion at the polls, and with the national election quickly approaching we decline to take that risk.

## IV.   CONCLUSION

Defendant argues that preliminary relief is inappropriate here for a number of other reasons, which we decline to address at this juncture because Plaintiff has failed to show that its entitlement to relief is "indisputably clear."[11] It cannot point to a deficiency that renders Defendant's program unreasonable, but instead argues

---

[11] Namely, Defendant argues that the commissioners for each county's board of elections are, at the very least, necessary parties to this suit because they have the final responsibility for removing deceased voters from the rolls. That may well be, and Defendants are free to raise that argument in the future. We need not address it now, however, because Plaintiff has not demonstrated a likelihood of success on the merits.

that its list of "apparently" deceased individuals speaks for itself. But those numbers tell a very different story, leading us to seriously question how many voters on Plaintiff's list are, in fact, deceased. We will not disenfranchise eligible voters based upon the data presented to us by Plaintiffs, and Defendant has no time to independently verify this list—a situation squarely of Plaintiff's own making. In an election where the margins may be razor-thin, we will not deprive the electorate of its voice without notice or proper investigation on the basis of an ill-framed and speculative venture launched at this late date.

<u>John E. Jones III</u>
John E. Jones III
Chief Judge
Middle District of Pennsylvania
United States District Court
